## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Timothy Chelstrom,                                    Civil No.  06-1059 (RHK/SRN)

       Plaintiff,

       v.                                            REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social Security,

       Defendant.

_____

Sean M. Quinn, Esq., on behalf of Plaintiff

Lonnie F. Bryan, Assistant United States Attorney, on behalf of Defendant

_____

SUSAN RICHARD NELSON, United States Magistrate Judge

       Pursuant to 42 U.S.C. § 405(g), Plaintiff Timothy Chelstrom seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"), who found Mr. Chelstrom not entitled to Disability Insurance Benefits (DIB) under the Social Security Disability Insurance Program, 42 U.S.C. §§ 416(i), 423(d).  The Commissioner determined that, during the claimed period, Mr. Chelstrom was capable of performing other substantial gainful work as defined in 42 U.S.C. § 423(d)(2) and thus, not eligible for disability benefits.  Mr. Chelstrom appeals the Commissioner's determination.  The parties submitted cross motions for summary judgment.  The matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c).

## I.      BACKGROUND

### A.      Procedural History

Mr. Chelstrom filed a claim for DIB on November 7, 2003, claiming that he became disabled

on January 9, 2003.  (Tr. at 77.)  The Commissioner initially denied Mr. Chelstrom's claim on

February 9, 2004.  (Tr. at 24-25.)  On April 27, 2004, the Commissioner also denied a subsequent

request for reconsideration.  (Tr. at 28-29.)

Mr. Chelstrom requested, and on July 11, 2005 received, a hearing before Administrative Law

Judge (ALJ) David K. Gatto.  (Tr. at  43, 394.)  At the hearing, Mr. Chelstrom was represented by his

present counsel.  (Id.)  Edward Utities testified as a neutral vocational expert.  (Id.)  On October 6,

2005, ALJ Gatto issued an opinion in which he found that Mr. Chelstrom's impairments were severe,

but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation

No. 4, and that, although Mr. Chelstrom could not perform his past relevant work, he was capable of

performing substantial gainful work in the national economy.  (Tr. at 17-21.)  As a result, ALJ Gatto

determined that Mr. Chelstrom was not disabled as defined in the Social Security regulations and not

entitled to benefits.  (Tr. at 15.)

Mr. Chelstrom then appealed ALJ Gatto's decision to the Social Security Appeals Council

("Appeals Council").  (Tr. at 10.)  On January 26, 2006, the Appeals Council denied Mr. Chelstrom's

request for review.  (Tr. at 6.)  Upon denial of his request for review by the Appeals Council, ALJ

Gatto's decision became the final decision of the Commissioner and subject to judicial review.  See 42

U.S.C. § 405(g).  On March 15, 2006, Mr. Chelstrom filed the action now before this Court.  (Doc.

No. 1.)  Plaintiff moves the Court for an Order reversing the final decision of the Commissioner, or in

the alternative, remanding the case for further administrative proceedings.  (Doc. No. 5.)  Defendant

moves for summary judgment affirming the Commissioner.  (Doc. No. 8.)

Specifically, Mr. Chelstrom contends that ALJ Gatto erred by declining to adopt the opinions

of Mr. Chelstrom's treating physicians regarding his inability to work.  (Pl.'s Mem. Supp. Mot. Summ.

J. at 8-9.)  In addition, Mr. Chelstrom argues that ALJ Gatto improperly discounted his account of his

seizure disorder symptoms, and failed to make the specific findings required before according little

weight to this evidence.  (Id. at 7.)

Defendant argues that ALJ Gatto properly declined to adopt the opinions of Mr. Chelstrom's

treating physicians because the opinions were conclusions of law reserved to the Commissioner.

(Def.'s Mem. Supp. Mot. Summ. J. at 1.)  In addition, Defendant contends that ALJ Gatto properly

discounted some of the subjective evidence in the record.  Finally, Defendant argues that substantial

evidence in the record supports ALJ Gatto's decision.  (Id.)

**B.      Factual Background**

Mr. Chelstrom was born on January 30, 1966, making him 39 years old at the time of the

hearing.  (Tr. at 56.)  He graduated from high school, but did not attend college or vocational school.

(Tr. at 399.)

Mr. Chelstrom alleges that he was unable to work from January 2003 until November 2004

due to the manifestations of the seizure disorder from which he suffers.  (Tr. at 77.)  This seizure

disorder, which Mr. Chelstrom developed in 1985, resulted from closed-head injuries he sustained in a

fall while working at the Azcon Corporation ("Azcon").  (Tr. 136, 378.)  At first, this disorder would

cause Mr. Chelstrom to lose consciousness, "grand mal seizures", but eventually only manifested itself

in "absence seizures," seizures during which he would remain conscious, but lose alertness.  (Tr. at 405.)  Mr. Chelstrom testified that, subsequent to the fall, he eventually returned to work at Azcon where he worked as a crane operator, laborer, machine operator and torchcutter until January 2003.  (Tr. at 145, 399.)  On January 7, 2003, Mr. Chelstrom was involved in another accident at work in which his abdomen was burned with a torch.  (Tr. at 77, 405.)  He testified that the pain from the accident likely induced the seizure he suffered at work the following day, and that Azcon subsequently terminated him because "they didn't want the liability of me any more."  (Tr. at 405, 407.)  Mr. Chelstrom did not work from January 9, 2003 until February 2005, but testified that he would have returned to work in November 2004, if he had found a position at that time.  (Tr. at 77, 405.)

Although Mr. Chelstrom's medical records reflect that he has received treatment for his seizure disorder since the 1985 accident, the Court will focus on Mr. Chelstrom's treatment from July 2002 through November 2004, the relevant time period.

In July 2002, Mr. Chelstrom received treatment from Dr. Ed. A. Crisostomo at Northland Neurology & Myology, PA, in Duluth, Minnesota.  (Tr. at 159.)  At that time, he was taking 400 mg. of Tegretol XR twice per day for seizure control and reported that he had "not had any seizure breakthrough recently."  (Id.)  He did, however, complain of fatigue as a possible side effect of the Tegretol, as well as depression, irritability and difficulty sleeping.  (Id.)  Dr. Crisostomo prescribed a regimen of medication which called for Mr. Chelstrom to slowly transition from Tegretol to Lamictal, of which he would eventually take 100 mg. twice per day.  (Id.)

On September 24, 2002, Mr. Chelstrom returned to Dr. Crisostomo for a scheduled re-evaluation.  (Tr. at 158.)  Mr. Chelstrom described himself as "off kilter" and "more tired."  (Id.)  He

4

reported having no seizures, but stated that he felt worse while taking Lamictal, as compared to Tegretol.  (Id.)  He also admitted to being depressed.  (Id.)  Dr. Crisostomo again changed Mr. Chelstrom's medication, this time prescribing a transition to Keppra, of which Mr. Chelstrom would eventually take 750 mg. twice per day.  (Id.)  Dr. Crisostomo also wrote that, if Mr. Chelstrom "tolerat[ed]" the Keppra, he would prescribe an antidepressant in six weeks.  (Id.)

Six weeks later, on November 5, 2002, Mr. Chelstrom once again visited Dr. Crisostomo for a scheduled re-evaluation.  (Tr. at 157.)  He reported that he felt better after taking Keppra, but that he was still depressed.  In response, Dr. Crisostomo prescribed 10 mg. of Lexapro, to be taken daily. (Id.)

On December 10, 2002, Mr. Chelstrom returned to Dr. Crisostomo for another scheduled re-evaluation.  (Tr. at 156.)  According to Dr. Crisostomo, he stated that "he had not felt this well in a long time."  (Id.)  He reported no side effects from the Lexapro and informed Dr. Crisostomo that he did not feel depressed.  (Id.)  Dr. Crisostomo did not alter his pharmaceutical regimen and instructed him to return in six months for a re-evaluation.  (Id.)

On February 21, 2003, Mr. Chelstrom had a neurological exam with Dr. Donald Starzinski. (Tr. at 297.)  Dr. Starzinski noted that Mr. Chelstrom stated that he had had only two "complex partial-type" seizures since January 2003, "which represent[ed] very good seizure control for him." (Tr. at 298.)

On April 9, 2003, Mr. Chelstrom sought treatment at the Duluth Clinic from Dr. Lynn E. Quenemoen, a physician in the Occupational Medicine Department.  (Tr. at 203.)  Mr. Chelstrom mentioned that he had "been unemployed since [January 2003] and [was] unable to pay for his

medical expenses." (Id.)  He reported to Dr. Quenemoen that he experienced absence seizures roughly twice per month and revealed that he was having difficulty affording his Keppra medication. (Tr. at 203-204.)  Dr. Quenemoen opined that Mr. Chelstrom could work in a non-safety-sensitive job, but he that he could not operate equipment or vehicles, or work at unprotected heights.  (Tr. at 205.)

On May 20, 2003, Mr. Chelstrom visited Dr. Wolcott S. Holt, a neurologist at the Duluth Clinic, for treatment of his seizure disorder.  (Tr. at 201.)  In his review of Mr. Chelstrom's symptoms, Dr. Holt reported that Mr. Chelstrom "ha[d] frequent blackout spells, blurriness of vision, [and] difficulty hearing..." (Id.)  In addition, Dr. Holt noted that Mr. Chelstrom's "eating has been out of control, [he] has little interest in doing things, feels hopeless, depressed, down in the dumps."  (Id.) Under "Present Medications," Dr. Holt recorded that Mr. Chelstrom was taking Keppra and Lexapro, and commented that "[h]e is going to run out of money to control this."  (Tr. at 201.)

On May 27, 2003, Mr. Chelstrom underwent extended two-day video EEG monitoring at St. Mary's Medical Center in Duluth, Minnesota.  (Tr. at 163.)  Prior to the testing, he reported suffering from monthly absence seizures.  Dr. Richard J. Kanoff reported that, over the course of the EEG, he suffered one two-hour absence seizure, on the first day, and one fifteen-minute event on the second day.  (Tr. at 169-170.)  Dr. Kanoff further noted that these events were "nonepileptic in nature" and that the EEG was "otherwise normal."  (Tr. at 170.)  From May 28 through May 30, Mr. Chelstrom underwent an "ambulatory EEG" during which he suffered no absence seizures.  (Tr. at 200.)

On July 24, 2003, Dr. Holt followed up with Mr. Chelstrom regarding his EEG.  (Tr. at 198.) He noted that Mr. Chelstrom's seizure disorder was of an undetermined nature.  (Id.)

On October 24, 2003, Dr. Holt completed a Minnesota Department of Economic Security unemployment benefits-related form for Mr. Chelstrom.  (Tr. 172-173.)  In response to the question, "Was it medically necessary for the patient to leave the above employment due to this disability? Yes or No.  If yes, explain why:", Dr. Holt wrote

> Six, was it medically necessary due to illness - yes.  Explain - the patient has episodes of loss of consciousness felt to be seizure activities at one time and then follow up evaluation including prolonged EEG telemetry normal.  He works around heavy equipment and endangering himself of injury or others is high.

(Tr. 172-173.)  In addition, in response to the question, "Current ability to work: Totally unable, Fully able, without restrictions, Limited ability, explain below," Dr. Holt answered, "totally unable."  (Id.)

On January 5, 2004, Dr. William Paule, MD, a physician with Disability Determination Services ("DDS") who was asked to provide an opinion on Mr. Chelstrom's residual functional capacity, stated the following regarding Mr. Chelstrom's medical condition and his ability to pursue employment:

> He has no evidence of intellectual dysfunction, balance dysfunction, etc. and I think [he] probably deserves an RFC indicating that he should not work at heights, around moving machinery, or be doing things such as operating a crane above people's heads or driving a motor vehicle.  I think that would be reasonable.  I don't see evidence that is consistent with his total inability to work because these spells are unidentified and there is no evidence of seizure disorder in anything presented.

(Tr. at 221-222.)  He opined that Dr. Holt's October 24, 2003, assessment of Mr. Chelstrom as "totally unable" to work was inconsistent "with the objective data noted in the chart with the absence of an (sic) EEG evidence of seizure activity with no spells for at least 3 months in late 2002, so he did not fit any of the seizure criteria."  (Tr. at 221.)

On January 20, 2004, Marlin Trulsen, Ph.D., LP, examined Mr. Chelstrom for Minnesota Social Disability Services.  (Tr. at 176-180.)  Dr. Trulsen reported that, despite his "significant difficulty" with short-term memory, Mr. Chelstrom exhibited average overall intellectual functioning, the ability to respect authority and interact with others, adequate persistence and pace, and that he functioned at general age-level expectations for simple tasks, but at a low average level in complex tasks.  (Tr. at 179.)  He suggested that Mr. Chelstrom "explore employment counseling to increase the number of opportunities for him.  Work with computers may be an option as he currently enjoys this and does this regularly at home."  (Id.)  However, he noted that "[a] medical review would be essential in order to reassure Mr. Chelstrom of his ability per recommendations."  (Id.)

On April 27, 2004, another medical consultant, Dr. Dan Larson, M.D., apparently reviewed Dr. Paule's assessment and Mr. Chelstrom's file, and affirmed Dr. Paule's assessment.  (Tr. at 220.)

Shortly thereafter, on May 5, 2004, Mr. Chelstrom again sought treatment for his seizure disorder from Dr. Holt.  (Tr. at 341.)  Dr. Holt noted that Mr. Chelstrom described "fairly frequent episodes of disorientation, marked fluctuation of personality where one minute he is happy and the next minute he is upset.  He gets glassy-eyed, disoriented, and almost nightmarish and tends to want to be postictally lethargic."  (Tr. at 341.)  Mr. Chelstrom revealed his financial difficulties to Dr. Holt who recorded that "[h]e is applying for Social Security Disability but has been turned down once and the question is that with these spells now that his medical care will be covered."  (Id.)  He issued the following assessment of Mr. Chelstrom's condition: "Paroxysmal spells of disorientation and change, the exact cause of which is not clear in the sense that there is no definite history of loss of consciousness to go along with his past history of posttraumatic epilepsy related to an injury.  He is not

8

sleeping, he is depressed."  (Id.)  Dr. Holt provided Mr. Chelstrom with a two week trial of Zoloft, for

his depression, and noted that Mr. Chelstrom should contact him at the conclusion of that two-week

period.  (Id.)  Dr. Holt subsequently issued a "Report of Work Ability" that indicated that Mr.

Chelstrom was "[o]ff work until reevaluated."  (Tr. at 340.)

Three months later, on August 5, 2004, Mr. Chelstrom again met with Dr. Quenemoen.  (Tr.

at 381.)  She noted that Mr. Chelstrom was suffering from between one and three seizures per month.

(Id.)  She noted that he could not afford the full dosage of his medication, but that he does follow up

with Dr. Holt.  (Id.)  Finally, she stated that "[w]hen he has his episodes he does not feel safe to drive

or operate equipment or work in dangerous areas."  (Id.)  She also noted that he was taking Zoloft for

depression and not Lexapro.  (Id.)  Dr. Quenemoen also completed a "Report of Work Ability" which

indicated that Mr. Chelstrom should remain "[o]ff work until reevaluated," and scheduled a

neuropsychological evaluation for Mr. Chelstrom with a Dr. Murrey on September 1, 2004.  (Tr. at

390.)  Dr. Murrey apparently conducted this evaluation and generated a report, but the report itself is

absent from the record.  Duluth Clinic records contained in the record, however, state that:

> The report from Dr. Murrey indicates that [Mr. Chelstrom's] intellectual and
> cognitive functioning is well within normal limits.  The testing also indicates that his
> working memory is within the normal range.  At the time of the evaluation the patient
> apparently endorsed a very high level of depressive symptoms and it was Dr.
> Murrey's (sic) that he had a mood disorder secondary to his medical condition.

(Tr. at 378-379.)

On November 10, 2004, Mr. Chelstrom again sought treatment from Dr. Quenemoen.  (Tr. at

378.)  She noted that "[f]or a period of time, the insurance company was not paying for his medication

and he could not afford the full dosage, and so he began experiencing recurrences of the syncopal

episodes." (Id.) However, she continued, "[e]ventually [Mr. Chelstrom's] Keppra was covered (sic) the work comp carrier and since then he was placed back on his full dosage of 750 mg b.i.d. He has had no further episodes and feels great." (Id.) She opined, "From a physical and emotional standpoint he certainly seems ready to resume work." (Tr. at 379.) In addition, Mr. Chelstrom had unilaterally discontinued his Zoloft because he believed it made him feel tired and was not effective. (Tr. at 378.) The Report of Work Ability which she completed on the same day indicated that Mr. Chelstrom could return to work, but should not operate equipment, pending clearance from his neurologist. (Tr. at 389.)

On November 12, 2004, Mr. Chelstrom again visited Dr. Holt. Dr. Holt opined that "it is very unlikely that [Mr. Chelstrom] has active, posttraumatic, non-convulsive absence epilepsy. In light of this, I think he can gainfully return to driving equipment. I think he probably has resolved seizures, posttraumatic in nature, stemming from a prior injury in 1985." (Tr. at 377.) Dr. Holt indicated on Mr. Chelstrom's Report of Work Ability form that Mr. Chelstrom could return to work with no limitations. (Tr. at 388.)

C.    **Hearing Testimony**

The following persons testified at the hearing: Mr. Chelstrom and Edward Utities, the Vocational Expert.

1.    **Mr. Chelstrom's Testimony**

Mr. Chelstrom testified that he initially returned to work at Magic Carpet in February 2005, but that, at the time of his hearing, he was employed as a carpet layer at Arrowhead Flooring. (Tr. at 409.) He stated that he did not work at all from January 2003 to February 2005. (Tr. at 399.) He

admitted that he looked for work at some point after he was fired.  (Tr. at 400.)  He testified that he

"went to a place where I was supposed to be a sports-oriented person they were looking for.  It

ended up being selling vacuum cleaners, so I was kind of disappointed about that."  (Id.)  He testified

that he was confused about his ability to work and that he "stayed at home and watched [his] kids."

(Id.)  He discussed his problems with depression, but admitted that he had not seen a psychologist.

(Tr. at 400-401.)  He stated that he took Lexapro, as prescribed by his neurologists, although he

asked Dr. Holt to change his medication.  (Tr. at 401-402.)  He also admitted that he stopped taking

the Zoloft prescribed by Dr. Holt because he believed that it caused seizures and undesirable side

effects.  (Tr. at 402.)

He said that between January 2003 and November 2004, he would have absence seizures "at

least once a week."  (Tr. at 403-404.)  He described these seizures as follows: "It's kind of like being

in a fog and you cannot concentrate on anything.  You've got no peripheral vision, you're very dizzy,

very disoriented.  I have a hard time keeping my balance."  (Tr. at 405.)  He isolated stress and pain

as factors that might precipitate the seizures, but also stated that they might happen at random.  (Tr. at

405, 409.)  He specifically attributed his January 8, 2003 seizure to the burn he had suffered the

previous day at work.  (Id.)

He testified that he thought that he had taken Keppra for at least a year and a half, although he

was not certain about the exact period of time he took the drug.  (Tr. at 410.)  In addition, he

mentioned that, at one point, he had stopped taking Keppra and then continued taking it at a later time.

(Id.)  Finally, he stated that the frequency of his seizures increased in January 2003 because he was

under increased stress.  (Tr. at 410.)

### 2.     VE's Testimony

ALJ Gatto posed the following hypothetical question to the VE:

> If you had a man with the same education and vocational background of Mr.
> Chelstrom who is between the ages of 36 and 39, and who had the severe
> impairments of a seizure disorder, and a bipolar type disorder with their mood swings,
> depression and anxiety, and those impairments limited that man, there would be no
> limits on lifting, standing or time on feet, but there would be seizure precautions of no
> hazards, such as exposure to heights or moving machinery, no climbing of ladders,
> ropes or stairs, no heavy equipment operation or driving, and the work would further
> be limited to understanding, remembering and carrying out simple and routine
> repetitive one to two-step instructions and tasks, brief and superficial contact with all
> others in the workplace, including co-workers, supervisors and the public, if you had
> somebody with those limitations, would that person be able to do any of Mr.
> Chelstrom's past relevant work?

(Tr. at 411-412.)  The VE answered, "no."  ALJ Gatto then asked "[w]ith those limitations would

there be any other work that that person could do?"  The VE answered,

> There would be unskilled work, Judge, that was basically repetitious in nature.  Many
> of the – actually there are no physical lifting parameters.  One of the larger categories
> of jobs is the job of hand packager, which is a medium unskilled occupation, of which
> the better than the 8,000 within the State of Minnesota would certainly fall within those
> parameters.

(Tr. at 413.)  He also stated that Mr. Chelstrom could work as a packing floor worker, a machine

packager, a final assembler, a band attacher, or a pushing reel assembler.  (Tr. at 413-414.)

However, he acknowledged that most employers only allow two days of sick leave, or vacation, per

month and that, if someone missed three to five days of work per month, these absences would

preclude that person's employment in any of these jobs.  (Tr. at 414.)  Finally, he stated that in order

to maintain any employment, Mr. Chelstrom, even if physically present at work, "would have to be

able to concentrate to the point where he'd be able to perform the basic work functions."  (Tr. at

415.)

## II.   PROCESS OF REVIEW

"The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  The Social Security Act includes within its definition of "disability" the inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d); Battles v. Sullivan, 902 F.2d 657, 659 (8th Cir. 1990).

### A.   Administrative Law Judge Hearing

If the initial application for disability benefits is denied, a claimant may request a *de novo* reconsideration.  20 C.F.R. §§ 404.907; 404.909.  Any claimant dissatisfied with the reconsideration may request a hearing before an ALJ.  42 U.S.C. § 405(b)(1); 20 C.F.R. §§ 404.929, 422.203.

The ALJ must follow a five-step analysis in determining whether a claimant was disabled during the relevant time period:

1.   Was the claimant engaged in substantial gainful activity during the relevant time period?
2.   Was the claimant suffering from a medically severe impairment or combination of impairments during the relevant time period?
3.   Did the claimant's impairment(s) meet or equal a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1?
4.   Did the claimant have the residual functional capacity (RFC) to perform the claimant's past relevant work during the relevant time period?
5.   Was there any other work in the national economy that the claimant could perform during the relevant time period?

20 C.F.R. §§ 404.1520(b)-(f); see also Bowen v. Yuckert, 482 U.S. 137, 140-141 (1987).  Once

the claimant demonstrates his impairments prevented him from performing his previous work, the

burden shifts to the Commissioner to prove that jobs exist in the national economy that the claimant

could perform.  Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).

### B.      Appeals Council Review

If dissatisfied with the ALJ's decision, a claimant may request review by the Appeals Council,

which may choose to hear or deny that request.  20 C.F.R. § 404.967.  The decision of the Appeals

Council (or the ALJ if the Appeals Council denies the review request) is the final decision of the

Commissioner, and is binding upon the claimant unless appealed to Federal District Court within 60

days after notice of the Appeals Council's action.  42 U.S.C. § 405(g); 20 C.F.R. § 404.981.

### C.      Judicial Review

Judicial review of the Commissioner's decision is limited to a determination of whether the

decision is supported by substantial evidence in the record as a whole.  Hutsell v. Sullivan, 892 F.2d

747, 748-49 (8th Cir. 1989); see 42 U.S.C. § 405(g).  Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v.

Perales, 402 U.S. 389, 401 (1971).  The review is "more than a mere search of the record for

evidence supporting the [Commissioner's] finding."  Brand v. Secretary of the Dep't. of Health,

Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980).  Rather, "'the substantiality of evidence

must take into account whatever in the record fairly detracts from its weight.'"  Brand, 623 F.2d at

527 (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

The reviewing court must review the record and consider:

1.      The credibility findings made by the ALJ,

2. The Plaintiff's vocational factors,

3. The medical evidence from treating and consulting physicians,

4. The Plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments,

5. Any corroboration by third parties of the Plaintiff's impairments, and

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989) (citing Brand, 623 F.2d at 527). A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion, Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984), and in reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact, Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm that decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

## III. THE FINDINGS AND OPINION OF THE ADMINISTRATIVE LAW JUDGE

At the first step of the five-step disability analysis, ALJ Gatto found that Plaintiff had not engaged in substantial gainful activity from January 9, 2003 through February 1, 2005. (Tr. at 16.)

At the second step, ALJ Gatto found that the evidence as a whole established that Mr. Chelstrom's seizure disorder and depression constituted severe impairments within the meaning of 20 C.F.R. 404.1520(c). At the third step, ALJ Gatto concluded that Mr. Chelstrom was not subject to

any impairment, or combination of impairments, that met or equaled the requirements of the Listing of

Impairments in Appendix 1, Subpart P, Regulation No. 4.  (Id.)

At the fourth step, ALJ Gatto determined Mr. Chelstrom's RFC.  (Tr. at 25.)  In doing so, he

evaluated Mr. Chelstrom's subjective complaints according to Polaski v. Heckler, 739 F.2d 1320 (8th

Cir. 1984).  (Tr. at 18.)  ALJ Gatto determined that Mr. Chelstrom retained the RFC

> to perform work not involving climbing ladders, ropes, and scaffolds, not involving
> work around heights or machinery, with no requirement to operate heavy equipment,
> that involves simple routine, repetitive one to two step tasks with no more than brief
> and superficial contact with the public, co-workers, and supervisors.

(Id.)  He determined that Plaintiff's subjective complaints regarding the duration and frequency of his

seizures were not entirely credible.  (Id.)  In particular, ALJ Gatto noted that Mr. Chelstrom's

testimony regarding the frequency and duration of his seizures was inconsistent with his description of

the same to his treating physicians.  (Id.)  ALJ Gatto found, "there is no evidence that the frequency or

severity of the claimant's seizures increased at the time of the alleged onset day or that he required

significantly more time to recover from them than when he was working."  (Tr. at 19.)  ALJ Gatto

found that Dr. Holt's conclusion that Mr. Chelstrom was totally unable to work was not entitled to

great weight because Dr. Holt used the words "off work" and "no work using heavy equipment"

interchangeably, and because limiting Mr. Chelstrom to performing no work with heavy equipment

was not consistent with "the inability to perform work of any type."  (Id.)  Finally, ALJ Gatto found

that since the record demonstrated that Mr. Chelstrom had suffered no absence seizures from May

2004 through November 2004, there was a clear inconsistency between Dr. Holt's opinion and the

medical record as a whole.  ALJ Gatto recognized that Mr. Chelstrom informed Dr. Holt that he could

not afford to pay for his Keppra prescription, but noted that there was no evidence that Mr. Chelstrom requested samples or sought free medical care.  (Id.)  Moreover, ALJ Gatto emphasized that Plaintiff unilaterally stopped taking Zoloft.  (Id.)

ALJ Gatto noted that Mr. Chelstrom received a GAF score of 60 in his psychological evaluation, and that he engaged in a wide variety of activities in his daily life, including caring for his children, cooking, helping with laundry and dishes and socializing with friends.  (Tr. at 20.)  With that RFC in mind, ALJ Gatto determined that Plaintiff could not perform his past relevant work as a crane operator and burner.  (Id.)  However, based upon the VE's testimony and the RFC assigned to Mr. Chelstrom, ALJ Gatto found that he was able to engage in various jobs in the national economy.  (Id.)  Therefore, ALJ Gatto concluded that Plaintiff did not meet the criteria for a finding of disability during the relevant time period.  (Id.)

## IV.   DISCUSSION

The parties agree that Mr. Chelstrom's seizure disorder and depression constituted severe impairments during the relevant time period and that these impairments did not meet, or medically equal, one of the listed impairments in 20 C.F.R. 404, Subpart P. Appendix 1, Regulations No. 4. Moreover, the parties agree that Mr. Chelstrom lacked the RFC to perform his past relevant work as a crane operator and torchcutter for Azcon.  Therefore, the sole issue before the Court is whether substantial evidence in the record supports ALJ Gatto's finding that, during the relevant time period, Mr. Chelstrom was capable of performing any other substantial gainful work in the national economy. Mr. Chelstrom argues that ALJ Gatto improperly discounted the opinions of his treating physicians and discredited his personal account of the symptoms of his seizure disorder.  (Pl.'s. Mem Supp. Mot.

17

Summ. J. at 8.)

### A.     Evaluation of the Opinion of Mr. Chelstrom's Treating Physicians

Mr. Chelstrom argues that, during the relevant time period, Plaintiff's treating physicians

opined that he was unable to work.  (Id.)  A treating physician's opinion is accorded controlling weight

where it is well supported by medically acceptable techniques, and is not inconsistent with other

substantial evidence in the record.  20 C.F.R. § 404.1527(d).  Nonetheless, whether a claimant is

disabled is a determination reserved for the Commissioner, and a statement by a medical source

regarding disability is not dispositive.  20 C.F.R. § 404.1527(e)(1).  Opinions regarding disability are

not entitled to the same weight as other medical opinions.  20 C.F.R. § 404.1527(e)(3).  "While we

recognize that the treating physician is entitled to particular deference, his statements as to the ultimate

issue of disability are not controlling."  Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991).

The Court finds that substantial evidence in the record supports ALJ Gatto's decision to

decline to give considerable weight to the opinions of certain of Mr. Chelstrom's treating physicians as

to whether Mr. Chelstrom was disabled from working.  In his decision, ALJ Gatto addressed Dr.

Holt's October 24, 2003 and May 05, 2004 opinions, as well as Dr. Quenemoen's August 5, 2004

opinion, and the Court will discuss each of these opinions in turn.  (Tr. at 19.)

First, in considering Mr. Chelstrom's ability to perform other substantial gainful work, ALJ

Gatto declined to accord great weight to Dr. Holt's October 24, 2003 opinion that Mr. Chelstrom

was "[t]otally unable" to work because he found that, despite the broad language of this statement, Dr.

Holt only intended to prohibit Mr. Chelstrom from performing work which involved the operation of

heavy equipment or driving, namely the type of work in which Mr. Chelstrom had previously engaged.

18

(Tr. 19.)  On October 24, 2003, Dr. Holt completed a questionnaire from the Minnesota Department

of Economic Security.  (Tr. at 172.)  In response to the question, "Was it medically necessary for the

patient to leave the above employment due to this disability? Yes or No.  If yes, explain why:", Dr.

Holt wrote

> Six, was it medically necessary due to illness - yes.  Explain - the patient has episodes
> of loss of consciousness felt to be seizure activities at one time and then follow up
> evaluation including prolonged EEG telemetry normal.  He works around heavy
> equipment and endangering himself of injury or others is high.

(Tr. at 172-173)  In this context, "the above employment" seems to refer to Mr. Chelstrom's crane

operator and torchcutter position at Azcon.  (Tr. 172.)  In response to the question, "Current ability to

work: Totally Unable, Fully Able, without restrictions, Limited Ability, explain below," Dr. Holt

answered, "Totally Unable."  (Id.)  While this question did not explicitly address Mr. Chelstrom's

former occupation, the surrounding questions on the same form did.  (Tr. at 172.)  Therefore, it was

reasonable for ALJ Gatto to interpret the question as referring to Mr. Chelstrom's current ability to

work in his former occupation.

Moreover, ALJ Gatto's reading is consistent with the medical evidence prior to October 24,

2003.  While Mr. Chelstrom's May 20, 2003 and July 24, 2003 visits to Dr. Holt yielded reports that

Mr. Chelstrom continued to suffer from absence seizures, neither report contained the specific number

of seizure occurrences over any given time period.  (Tr. at 198, 201.)  However, on February 21,

2003, Mr. Chelstrom reported to Dr. Starzinski that he had only suffered two seizures, or roughly one

per month, since January 2003.  In his April 9, 2003 visit with Dr. Quenemoen, Mr. Chelstrom

complained of experiencing seizures roughly twice per month.  (Tr. 203-204.)  In response, Dr.

Quenemoen opined that Mr. Chelstrom could work in a non-safety sensitive job, one that did not entail operating equipment or vehicles, or involve work at unprotected heights. (Tr. at 205.) When Mr. Chelstrom underwent EEG testing from May 27, 2003 through May 30, 2003, he told Dr. Kanoff that he was experiencing "monthly" seizures. (Tr. at 163.) Therefore, substantial evidence in the record indicates that, during this time period, Mr. Chelstrom was suffering from between one and two absence seizures per month, and these seizures did not prevent him from working in certain environments.

ALJ Gatto again found that, despite its broad language, Dr. Holt's May 5, 2004 opinion that Mr. Chelstrom should remain "[o]ff work until reevaluated" directly pertained to Mr. Chelstrom's ability to pursue his previous occupation, and not to his capacity to perform other substantial gainful employment. The Court again finds substantial evidence in the record to support ALJ Gatto's interpretation of the record. In fact, Mr. Chelstrom's testimony supports ALJ Gatto's interpretation. In response to ALJ Gatto's question, "Did your doctors restrict you from working for any period of time?", Mr. Chelstrom testified, "Dr. Holt had me off from the type (INAUDIBLE) I lost my job to November 2004." (Tr. at 403.) While the hearing transcript is less than clear on this point, Mr. Chelstrom's testimony suggests that Dr. Holt's only restrictions pertained to his past work.

ALJ Gatto also properly discounted Dr. Quenemoen's August 5, 2004 opinion that Mr. Chelstrom should remain "off work until reevaluated." (Tr. at 390.) Dr. Quenemoen reported that Mr. Chelstrom was suffering from between one and three absence seizures per month at the time of his visit of the same date. (Tr. at 381.) In addition, however, she noted that "[o]ther than these episodes and his short-term memory difficulty he physically feels strong and well. When he has his episodes he

does not feel safe to drive or operate equipment or work in dangerous areas." (Id.)  As part of Mr.

Chelstrom's treatment plan, she arranged for Mr. Chelstrom to undergo an evaluation with Dr. Murrey

on August 17, 2004.  (Tr. at 381, 390.)  On November 10, 2004, Dr. Quenemoen noted that Dr.

Murrey's report

> indicate[d] that [Mr. Chelstrom's] intellectual and cognitive functioning is well within
> normal limits.  The testing also indicate[d] that his working memory [was] well within
> the normal range.  At the time of the evaluation the patient apparently endorsed a very
> high level of depressive symptoms and it was Dr. Murrey's opinion that he had a
> mood disorder secondary to his medical condition.

(Tr. at 378-379.)  Therefore, although it appears that Mr. Chelstrom could not return to his prior

work, there is no evidence in the record to support a finding that he was disabled from any kind of

work.

**B.      Evaluation of Mr. Chelstrom's credibility**

In evaluating subjective complaints, the ALJ must:

> give full consideration to all of the evidence presented relating to subjective complaints,
> including the claimant's prior work record, and observations by third parties and
> treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints
> solely on the basis of personal observations.  Subjective complaints may be discounted
> if there are inconsistencies in the evidence as a whole.

Polaski, 739 F.2d at 1322 (emphasis in original).  "An ALJ who rejects a claimant's complaints,

however, must make an express credibility determination explaining his reasons for discrediting the

complaints." Ghant v. Bowen, 930 F.2d 633, 637 (8th Cir. 1991).  Credibility determinations must

be supported by substantial evidence.  Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988).

Mr. Chelstrom argues that ALJ Gatto improperly discredited his account of his seizure

disorder because the ALJ's opinion did not explicitly set forth the Polaski factors which he analyzed.

In addition, Mr. Chelstrom contends that ALJ Gatto improperly discounted the evidence in the record

regarding his inability to pay for his medication.

While he did not mention them explicitly, ALJ Gatto discussed each of the relevant Polaski

factors.  (Tr. at 18-19.)  First, the ALJ specifically discussed Mr. Chelstrom's daily activities including

caring for his children, cooking simple meals, yard work, washing dishes and running errands.  (Id.)

Second, he also described how Mr. Chelstrom's medication provided "good seizure control."  (Tr. at

18.)  Third, ALJ Gatto addressed Mr. Chelstrom's functional limitations when he noted that the

consulting psychologist had given Mr. Chelstrom a GAF score of 60, consistent with mild to moderate

symptoms, and that his depression with irritability and difficulty concentrating limited him to "work that

is simple, routine and repetitive, involves only one or two step tasks, and requires not more than brief

and superficial contact with the public, co-workers, and supervisors."  (Tr. at 19.)  Finally, ALJ Gatto

inquired into the duration and frequency of Mr. Chelstrom's seizures and concluded that

> there is no evidence that the frequency or severity of the claimant's seizure events
> increased at the time of the alleged onset date, or that he required significantly more
> time to recover from them than when he was working.

(Tr. at 19.)  An ALJ "need not explicitly discuss" each Polaski factor, if the ALJ "acknowledges and

considers those factors before discounting a claimant's subjective complaints."  Goff v. Barnhart, 421

F.3d 785, 791 (8th Cir. 2005).

Moreover, when a challenge to a nondisability finding is made by a claimant who contends that he could not take his prescribed medications because he could not afford them, the ALJ must consider whether there is substantial evidence in the record that the treatment was ineffective because the claimant could not afford the cost of his medications.  <u>Ricketts v. Sec'y of Health & Human Servs.</u>, 902 F.2d 661, 664 (8th Cir. 1990).  The record does contain some evidence that Mr. Chelstrom experienced difficulty affording his Keppra medication.  (Tr. at 201, 203-204, 341, 381, 378.) However, the record does not contain evidence that clearly identifies the length of time that Mr. Chelstrom could not afford his medication nor does it contain any evidence that Mr. Chelstrom's treatment was ineffective because he could not afford his medication.

In May 2003, Dr. Holt reduced Mr. Chelstrom's Keppra intake to 500 mg. per day from 1500 mg. per day and, wrote in his notes under "Present Medications" that "[h]e is going to run out of money to control this."  (Tr. at 201.)  However, Dr. Holt provided Mr. Chelstrom with samples of Keppra.  (<u>Id.</u>)  On July 24, 2003, Dr. Holt restored Mr. Chelstrom to his full dosage of 1500 mg. of Keppra per day, and, in addition, he did not mention that Mr. Chelstrom suffered from increased seizures in the interim period.  (Tr. at 198.)  Likewise, he did not report that Mr. Chelstrom was having difficulty affording his medication, either at that time or in the interim period.  (<u>Id.</u>)  In August 2004, Dr. Quenemoen noted that Mr. Chelstrom could only afford to purchase half of the 1500 mg. daily of Keppra prescribed by Dr. Holt.  (Tr. at 381.)  Nonetheless, she did not state at what point Mr. Chelstrom began taking a half dose.  (<u>Id.</u>)  Likewise, she did not state that the frequency of Mr. Chelstrom's seizures increased for any period of time.  (<u>Id.</u>)  Moreover, in her November 10, 2004 notes, Dr. Quenemoen reported that he was again taking his full dosage of Keppra, 750 mg. twice per

day.  (Id.)  There is absolutely no evidence in the record to suggest that Mr. Chelstrom's treatment

was ineffective because he could not afford his medication.

Substantial evidence in the record supports the ALJ's decision and accordingly this Court

recommends that the decision of the Commissioner be affirmed.

**IT IS HEREBY RECOMMENDED that**:

        1)  Plaintiff's Motion for Summary Judgment (Doc. No. 5) be **DENIED;**

        2)  Defendant's Motion for Summary Judgment (Doc. No. 8) be

        **GRANTED**.

Dated: January 3, 2007

                                    s/ Susan Richard Nelson

                                  SUSAN RICHARD NELSON
                                  United States Magistrate Judge

Under D.Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January18, 2007**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.